IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

JODY HORCH,                          )
                                     )
            Plaintiff,               )
                                     )
      v.                             )    Case No.
                                     )    06-3010-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner )
of Social Security,                  )
                                     )
            Defendant.               )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jody Horch seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI
of the Social Security Act ("the Act").  Plaintiff argues
that the ALJ's residual functional capacity assessment is
not based on substantial evidence, and the ALJ erred in
failing to conduct a proper credibility analysis.  I find
that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be
denied and the decision of the Commissioner will be
affirmed.

## I.   BACKGROUND

On April 4, 2003, plaintiff applied for a period of
disability and disability insurance benefits alleging that

she had been disabled since February 28, 2003.  Plaintiff's

disability stems from fibromyalgia[1], carpal tunnel

syndrome[2], vasculitis[3], hyperthyroidism[4], Dysthymic

Disorder[5], and Pain Disorder associated with depression and

---

[1]"Fibromyalgia" is characterized by generalized muscular pain and fatigue.  Fibromyalgia is generally diagnosed when the following symptoms are present:  (1) A history of widespread pain (pain on both sides of the body and above and below the waist) that is present for at least three months, and (2) pain in at least 11 of 18 tender-point sites.

[2]"Carpal Tunnel Syndrom" is a progressive condition caused by compression of a key nerve in the wrist. It occurs when the median nerve, which runs from the forearm into the hand, becomes pressed or squeezed at the wrist.

[3]"Vasculitis" is a general term for a group of diseases that involve inflammation in blood vessels. Blood vessels of all sizes may be affected, from the largest vessel in the body (the aorta) to the smallest blood vessels in the skin (capillaries).

[4]"Hyperthyroidism" is a condition in which an over-active thyroid gland is producing an excessive amount of thyroid hormones that circulate in the blood.

[5]"Dysthymic Disorder" is characterized by chronic depression, but with less severity than a major depression. The essential symptom for Dysthymic disorder is an almost daily depressed mood for at least two years, but without the necessary criteria for a major depression. Low energy, sleep or appetite disturbances and low self-esteem are usually part of the clinical picture as well.  People who have Dysthymic disorder will often report that they don't recall ever not feeling depressed, but they may be relatively functional in managing their life, although the symptoms are severe enough to cause distress and interference with important life role responsibilities.

2

fibromyalgia[6].  Plaintiff's application was denied on June
20, 2003.  On August 16, 2004, a hearing was held before an
Administrative Law Judge, and a supplemental hearing was
held on June 21, 2005.  On August 3, 2005, the ALJ found
that plaintiff was not under a "disability" as defined in
the Act.  On November 19, 2005, the Appeals Council denied
plaintiff's request for review.  Therefore, the decision of
the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides
for judicial review of a "final decision" of the
Commissioner.  The standard for judicial review by the
federal district court is whether the decision of the
Commissioner was supported by substantial evidence.  42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401
(1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir.
2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);

---

[6]"Pain Disorder" can be diagnosed when a patient's
predominant complaint is of physical pain that is not
intentionally produced or faked and psychological factors
are judged to have played a significant role in the onset,
severity, exacerbation, or maintenance of the pain.  If
psychological factors play only a minimal role and the pain
disorder is associated with a general medical condition
only, then Pain Disorder is not considered a mental
disorder.

3

Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

4

***III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS***

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

5

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

### A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

6

**Earnings Record**

The record establishes that plaintiff earned the following income from 1987 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1987 | $ 1,248.05 | 1996 | $ 8,852.37 |
| 1988 | 5,341.58 | 1997 | 15,736.64 |
| 1989 | 7,099.68 | 1998 | 15,569.30 |
| 1990 | 9,339.79 | 1999 | 9,507.96 |
| 1991 | 7,377.17 | 2000 | 5,517.00 |
| 1992 | 4,068.03 | 2001 | 3,953.00 |
| 1993 | 5,334.73 | 2002 | 0.00 |
| 1994 | 8,723.16 | 2003 | 0.00 |
| 1995 | 12,396.70 | 2004 | 0.00 |

(Tr. at 106).

**Disability Report**

In a Disability Report completed by plaintiff on April 4, 2003, she reported that her illnesses, injuries, or conditions were "vasculitis" (Tr. at 111). She was limited in her ability to work because of "very painful legs and feet, unable to ambulate for long periods of time, legs aching at night at sleep time when having done too much during [the] day." (Tr. at 111). Plaintiff reported that she first became unable to work on February 28, 2003, but that she stopped working exactly one year before that

7

because she "was pregnant with 3rd child and needed to take some time off." (Tr. at 111).

**Claimant Questionnaire**

In a Claimant Questionnaire completed by plaintiff on June 12, 2003, she reported that she usually vacuums half the house one day and the other half another day (Tr. at 130). She reported that she cares for her spouse and three children: "meals, laundry, baths, tidy, clean up after them." (Tr. at 131).

**B.  *SUMMARY OF MEDICAL RECORDS***

February 28, 2003, is plaintiff's alleged onset date.

On February 28, 2003, plaintiff saw a nurse and complained of red spots on her legs and pain on the bottom of her feet (Tr. at 154, 187). Plaintiff stated that she was taking care of her terminally ill mother-in-law, and she was tearful. Plaintiff also saw Drew Shoemaker, M.D. (Tr. at 165, 189). Plaintiff had a rash on her feet which was "a little bit painful". Dr. Shoemaker assessed anxiety regarding taking care of her mother-in-law, ecchymosis/folliculitis (plaintiff's rash), and sinusitis. He prescribed Augmentin (an antibiotic).

On March 3, 2003, plaintiff saw Ronald Evans, M.D., for a sore ankle (Tr. at 163, 185). He assessed bursitis and

8

recommended ice and elevation.

On March 12, 2003, plaintiff saw Joseph Cooper, M.D.,
for leg pain and rash (Tr. at 197-198, 280-281). A complete
blood count was normal, a comprehensive metabolic panel was
normal. Plaintiff was given Toradol (a non-steroidal anti-
inflammatory) intramuscularly and her pain resolved. He
gave her some Prednisone (a steroid) and told her to follow
up with a dermatologist.

On March 14, 2003, plaintiff saw Timothy Deffer, M.D.,
a dermatologist (Tr. at 217). She described her leg rash as
moderately painful. He performed a biopsy of one leg lesion
which was determined to be Leukocytoclastic Vasculitis[7] (Tr.
at 220).

On March 27, 2003, plaintiff saw Lori Cohen, M.D., for
a follow up on her lower extremity vasculitis (Tr. at 161).
Dr. Cohen noted that plaintiff's condition was much
improved. Plaintiff complained that over the last month she
had felt tired with no energy to take care of her kids or to
home school. She recently had a normal complete blood count
and no evidence of anemia. Dr. Cohen assessed recent
vasculitis and significant fatigue. She referred plaintiff

---

[7]Leukocytoclastic vasculitis (LCV) is a histopathologic
term commonly used to denote a small-vessel vasculitis.

for a sleep apnea study.  She recommended vitamins, exercise, good eating habits, and good sleeping habits.

On March 28, 2003, plaintiff saw Timothy Deffer, M.D., a dermatologist (Tr. at 215).  He noted that she had continued crusting on the lower legs.  She had tapered off the Prednisone.  He continued her on ampicillin (an antibiotic) for four to six weeks until the crusts were healed.

On April 4, 2003, plaintiff filed her application for disability benefits.

On April 11, 2003, plaintiff saw Jeffrey Tedrow, M.D., after she turned her ankle (Tr. at 159).  X-rays were normal.  He assessed right foot sprain and recommended an Ace wrap for support and taking over-the-counter anti-inflammatories.

On April 23, 2003, plaintiff saw Cyndi Dancey, Physician's Assistant (Tr. at 157).  Plaintiff's right big toe was swollen and painful.  Ms. Dancey noted some resolving lesions from prior vasculitis that appeared to be healing well.  An X-ray of the big toe was taken which revealed no fracture or dislocation.  She was assessed with toe strain.  She was told to take Tylenol or Ibuprofen for pain.  She was told to avoid weight bearing exercise if it

10

was significantly painful.

On April 30, 2003, plaintiff saw Laura Vance, M.D. (Tr. at 156). Plaintiff complained of bilateral foot pain. After a physical exam, Dr. Vance noted that plaintiff had decreased range of motion of the major joints but was pain free. Muscle strength was within normal limits. She assessed plantar fasciitis[8], bilateral and Morton's neuroma[9] on the right foot. She told plaintiff to use a proper shoe with an insert, and do home physical therapy consisting of ice massage. She was prescribed Vioxx[10], to be taken daily.

On May 23, 2003, plaintiff saw Dr. Vance for a follow up (Tr. at 156). Plaintiff stated that she did not get the shoe inserts because she could not afford them, and she had an appendectomy so she had been off her feet and they felt better. Dr. Vance assessed plantar fasciitis with possible neuroma, resolving. Plaintiff was told to take Vioxx and get the shoe inserts.

_____

[8]Plantar Fasciitis is an inflammatory condition affecting the fascia on the bottom of the foot.

[9]Morton's neuroma is an enlarged nerve that usually occurs in the third interspace, which is between the third and fourth toes.

[10]Vioxx is a non-steroidal anti-inflammatory.

11

On June 3, 2003, Jeffrey Korte, DPM, completed a brief form sent by Disability Determinations (Tr. at 214). He was asked to describe plaintiff's ability to perform work-related functions. Dr. Korte wrote, "Pain noted when ambulating, ROM [range of motion] is decreased, Tenosynovitis[11] noted, can not walk long time, no heavy objects."

On August 28, 2003, plaintiff saw LaVonne Berg, M.D., an endocrinologist, for possible hyperthyroidism (Tr. at 230-232). Dr. Berg referenced plaintiff's sleep apnea study that had been done in March or April and which was normal. Dr. Berg found no evidence of elevated thyroid hormone level. Plaintiff said about once every four to six months she has a headache. Plaintiff was taking Phentermine daily for weight loss and was taking Cyclobenzaprine to help with the pain in her calves and to help her sleep, but she was taking that on an as-needed basis. Dr. Berg suspected plaintiff may have some rheumatologic disorder such as vasculitis or lupus. It was recommended that plaintiff stop taking the Phentermine and then to have her lab work repeated. She recommended that plaintiff go forward with

---

[11]Tenosynovitis involves inflammation of the tendon and tendon sheath.

12

the rheumatology consult.

On August 18, 2003, plaintiff underwent a motor nerve study and a sensory nerve study performed by Chris Weber, M.D. (Tr. at 223-224). He found a mild Left and Right median neuropathy at the wrist and supportive of the clinical diagnosis of carpal tunnel syndrome. He recommended "[c]onservative treatments including a course of O.Tx. for education, splint fitting, and home exercises, single routine NSAID [non-steroidal anti-inflammatory] for one week. Avoidance of provocative activities."

On August 28, 2003, plaintiff saw Laura Vance, M.D., for a follow up (Tr. at 265-266). Plaintiff stated that she was doing OK and had no new complaints. Dr. Vance encouraged plaintiff to lose weight through diet and exercise.

On September 22, 2003, plaintiff saw Anthony Tay, M.D., a rheumatologist, at the request of Dr. Vance (Tr. at 245-248). Plaintiff stated she noticed a decrease in energy the previous December but originally attributed that to having a new baby. She began feeling stiffness in her muscles, and she feels difficulty with reaching and bending. She described her pain as moderate to severe. She is able to do her activities of daily living but has very little energy

13

left.  She complained of poor memory.  She complained of
frequent headaches described as tightness around her head.
Plaintiff stated that her husband was working temporarily in
Michigan as he was unable to find a job in the Springfield
area.  "The family has a lot of debt, and she is concerned
about this."  Dr. Tay performed a physical exam and found
tender spots, but normal range of motion, plaintiff's affect
was normal, and she had normal short and long term memory.
He reviewed previous records and noted that on May 29, 2003,
plaintiff complained of muscle pain, but had done extensive
housework for six hours the day before.  She had full range
of motion in all her joints.  Dr. Tay assessed headaches and
muscle pain and weakness, etiology unclear, although he
suspected she may have fibromyalgia.  He ordered some blood
tests and told plaintiff to come back in three weeks.

On September 29, 2003, plaintiff saw LaVonne Berg,
M.D., at the citizens Memorial hospital Endocrinology Center
(Tr. at 229).  "She is somewhat distracted by the three
children that she has with her today, all fairly young."
Dr. Berg assessed a possible autonomously functioning
thyroid nodule.  Dr. Berg recommended she return in two
months with lab work prior to her visit.

14

On October 15, 2003, plaintiff saw Anthony Tay, M.D., her rheumatologist (Tr. at 239-241). Plaintiff had been doing stretching exercises for 15 minutes each morning. "Her pain is somewhat better, although she still has trouble with sleeping." Plaintiff stated that she wakes up exhausted in the morning, has difficulty staying asleep and falling asleep. Plaintiff's vasculitis was resolved. He assessed fibromylagia syndrome and insomnia. Plaintiff was told to continue her stretching exercises, and her prescribed Tiagabine [normally used to control seizures] at bedtime to help plaintiff sleep.

On December 1, 2003, plaintiff saw LaVonne Berg, M.D., her endocrinologist (Tr. at 228). All of plaintiff's lab tests were normal. Plaintiff stated that when she was on vacation in Michigan, she was feeling much better. Since she had been back home, she was more sleep exhausted and was feeling achy again. Dr. Tay had given her medication for sleeping, but she had not been using it. Dr. Berg assessed possible resolving thyroiditis (inflammation of the thyroid gland). Dr. Berg prescribed no treatment, but told plaintiff to come back in six to eight weeks to make sure she did not have a hypothyroid rebound.

15

On December 18, 2003, plaintiff saw Laura Vance, M.D.,
for a urinary tract infection (Tr. at 259-260).  She stated
that the rheumatologist felt she was doing too much and
recommended that she limit her activities, get more sleep,
and not to overwork and stress herself so much.  "[T]hat has
really worked for her.  For five weeks, she did nothing but
tried to keep her life simple and felt quite a bit better
during that time.  Unfortunately with the Christmas season,
she has been quite a bit busier and is starting to feel the
chronic fatigue again."  Dr. Vance noted that plaintiff
appeared more relaxed and comfortable.

On December 18, 2003, plaintiff underwent a sensory
nerve study, performed by Chris Weber, M.D. (Tr. at 222).
His impression was: "Interval improvement on Left to normal
values.  Mild persistent Right median neuropathy at the
wrist with minimal symptoms."  He recommended splinting,
non-steroidal anti-inflammatories, and avoidance of
provocative activities and crafts.

On January 2, 2004, plaintiff saw Anthony Tay, M.D.,
her rheumatologist (Tr. at 237-238).  Plaintiff reported
that she was taking Refocoxib with some improvement of her
pain, and she described her pain as mild, intermittent, achy
in quality, and is usually exacerbated when she "does too

16

much". Plaintiff was doing 15 minutes of stretching in the morning and then 15-20 minutes on the treadmill. Her energy was somewhat better. Plaintiff was taking Tiagabine for insomnia two to three times per week. "She generally gets enough rest." Plaintiff stated that she gets headaches two to three times a week when she gets too tired and tries to do too much with her three young children. Her headaches were relieved by rest, sleep, and over-the-counter medications. Plaintiff had no tenderness in her joints. She was alert and oriented, and she had normal short and longer term memory. Dr. Tay diagnosed fibromyalgia syndrome, improved. Plaintiff was advised to continue stretching and cardiovascular conditioning. Dr. Tay did not recommend a return appointment, and told plaintiff to continue her care with Dr. Vance.

On January 20, 2004, plaintiff saw Lori Cohen, M.D., to have moles checked (Tr. at 257-258). Plaintiff noted that she had had a few problems with her thyroid, "but overall feels that she is doing quite well and things are getting straightened now."

On January 26, 2004, plaintiff saw LaVonne Berg, M.D., her endocrinologist, for her thyroiditis (inflammation of the thyroid gland)(Tr. at 227). Plaintiff reported that she

17

was exercising, that she and her husband had gone through their house and organized everything which was taking some stress off of plaintiff. Dr. Berg assessed thyroiditis which had resolved. Plaintiff was discharged from the clinic.

On April 6, 2004, plaintiff saw LaVonne Berg, M.D., for an endocrine follow up (Tr. at 226). Plaintiff had been discharged from the endocrine clinic in January but requested to come back. She had done "quite good for a couple of months and was able to exercise, was sleeping better, and was not feeling so tired and groggy, but all of a sudden she felt like she ran into a brick wall." Plaintiff complained of fatigue, stiffness, problems with her grip, said she had to carry a book with both hands, and she was unable to focus. Dr. Berg suggested that plaintiff talk to her rheumatologist about the symptoms.

On April 8, 2004, plaintiff saw Anthony Tay, M.D., her rheumatologist (Tr. at 234-235). Plaintiff reported that she had improved some, was exercising and felt she had more energy. However, during the past three to four weeks she had experienced more achiness and occasional cramping in her legs. She said her pain was mild to moderate, continuous and was generally tolerable. Plaintiff was taking 1/2 to

18

1/4 tablet of Tiagabine for her insomnia.  She was not taking her Refocoxib, which was prescribed for muscle aches. During an exam, Dr. Tay noted that plaintiff had 100% hand grip, normal short and long term memory, and normal affect. He assessed fibromyalgia syndrome with typical tender points and insomnia secondary to pain.  He recommended that she continue with stretching.

On August 23, 2004, plaintiff saw Anthony Tay, M.D., her rheumatologist (Tr. at 319-321).  Dr. Tay noted that plaintiff's fibromyalgia had improved until three to four weeks ago when she started having spasms in her upper back. Her pain was mild to moderate, and generally tolerable. She knows of no precipitating factors.  She had not tried any medications for her back pain.  She said she was taking occasional tiagabine for her insomnia.  On exam, plaintiff had "mild tenderness" over the base of the neck.  She had some mild tenderness in her back.  She had 100% hand grip. She was observed to have normal long and short term memory and normal affect.  Dr. Tay assessed fibromyalgia and insomnia.  He prescribed Cyclobenzaprine at bedtime, which she previously was given by her podiatrist.  Plaintiff was encouraged to continue exercising.  She did not need a return appointment.

19

On August 26, 2004, plaintiff returned to see LaVonne Berg, M.D., her endocrinologist "for follow up of what I feel is a resolved subacute thyroiditis." (Tr. at 324). Plaintiff's last visit had been in early April. "When they lived in a condo, I believe her husband was doing a job somewhere and they were out of their house and out in a different state. She actually felt good in the condo and part of it was because she was not trying to do as much." Plaintiff said she would take a daily nap of at least an hour and that would help her get through the day. She was taking a half tablet of Gabitril before bed and Vioxx as needed. Dr. Berg assessed resolved thyroiditis, no follow up needed.

On September 16, 2004, plaintiff saw Steven Akeson, Psy.D., for a psychological consultation (Tr. at 300-304). Portions of Dr. Akeson's report read as follows:

> HISTORY OF CURRENT ILLNESS: . . . She has recently had thyroid problems but has not been treated yet as they are still working up the problem. . . .
>
> PSYCHOSOCIAL HISTORY: . . . There is a history of physical abuse by the father and emotional abuse by both parents. There was some emotional abuse at school from teacher. . . . She has been married to Daniel for about 17 years. They have three children. . . . She has been having problems with fibromyalgia the last 2 years. . . . Currently she is taking a muscle relaxer, a pain pill, and a sleep pill. The only medicine she can remember the name of is Vioxx. She stated she only

20

takes her medications when her pain is high.  She does
not take the medicine on a daily basis. . . .

ACTIVITIES OF DAILY LIVING:  The claimant reported she
is independent for all self-care, including bathing,
toileting, hygiene, dressing and eating.  She will
occasionally have problems with fasteners or opening
jars.  She is able to read, write, use the telephone,
handle mail and handle money.  Jody does the meal
preparation.  She and Daniel both do the cleaning and
laundry. . . .

PROCEDURES EMPLOYED:  The claimant was seen for
interview, mental status examination, administration of
the MMPI-2, and the completion of the Medical Source
Statement. . . .  This individual reported her mood to
be "pretty mellow." . . .

SUMMARY AND DISCUSSION:  . . .  Jody appears to be very
nice and sincere.  She appears to be perfectionistic
and internalizes stress.  There appears to be a
depressive disorder which is chronic as well as a pain
disorder which is exacerbated by her depression
(fibromyalgia).

DSM-IV DIAGNOSTIC IMPRESSION:
Axis I:    Dysthymic Disorder
           Pain Disorder associated with both depression
           and fibromyalgia
Axis II:   No diagnosis
Axis III:  Fibromyalgia by report
Axis IV:   Occupational problems:  Unemployment
Axis V:    GAF = 60 (current) (moderate symptoms)

CAPABILITIES:  The claimant's ability to perform work-
related functions appears unimpaired.
1.     The claimant is able to understand and remember
       complex instructions.
2.     The claimant is able to sustain concentration and
       persistence with complex tasks.
3.     The claimant is able to interact socially and
       adapt to her environment.
4.     This claimant appears to have the judgment and
       basic math skills to manage her own funds.

21

Dr. Akeson completed a Medical Source Statement -
Mental (Tr. at 305-307). He found that there was no
evidence of limits in any of the 20 traditional categories
of mental functioning.

On September 16, 2004, plaintiff saw Thomas Corsolini,
M.D., a member of the American Board of Physical Medicine
and Rehabilitation (Tr. at 308-311, 326-329). Portions of
Dr. Corsolini's report read as follows:

> PAST MEDICAL HISTORY: . . . Current medications
> include Vioxx about every 2 or 3 days with some stomach
> complaints, Flexeril, Tylenol or Advil, Gabitril to
> help her sleep at night and omega-3 fatty acid
> supplements for joint pain. This last medicine is new
> and has only been taken for about one week. . . . Her
> husband is a physical therapist's assistant, and she
> says that he takes jobs out of town that can last for
> several months at a time. She says that she and her
> children will usually travel with him when he has these
> jobs. . . . She says she sleeps about 7 or 8 hours per
> night.
>
> PHYSICAL EXAMINATION: Ms. Horch is 62 inches tall, 187
> pounds. General visual inspection shows that she
> carries much of her weight in her legs. She is able to
> walk smoothly without limp or hesitation. During the
> interview she is calm, pleasant and cooperative and
> does demonstrate some sense of humor. Muscle stretch
> reflexes normal bilaterally at biceps, triceps, and
> brachioradialis locations. Muscle stretch reflexes
> normal bilaterally at patellar and Achilles locations.
> Romberg test normal, tandem gait performance is good.
> Strength is grossly normal all muscle groups all four
> extremities. She is able to squat independently and
> the straight leg raising test is negative bilaterally.
> Palpation across the neck and back in general find some
> areas of some mild discomfort, but nothing that I would
> call true tenderness.

22

DISCUSSION: So far Ms. Horch has only been diagnosed as having fibromyalgia, a diagnosis that is not proven with any specific test. Her other testing has been nonspecific. No obvious musculoskeletal or neurological impairment is found on today's examination.

Plaintiff had normal range of motion in her shoulders, elbows, wrists, knees, ankles, hips, neck, and lumbar spine (Tr. at 310-311, 328-329). Grip strength was 5/5 bilaterally, upper extremity muscle strength was 5/5 bilaterally with good effort, lower extremity muscle strength was 5/5 bilaterally with good effort, and straight leg raising was negative.

Dr. Corsolini completed a Medical Source Statement - Physical, finding that plaintiff had no lifting restrictions, no standing or walking limitations, no sitting limitations, and no pushing or pulling limitations (Tr. at 312-315, 330-333). He found that she could occasionally climb, balance, kneel, crouch, crawl, and stoop. He found that she had an unlimited ability to reach, handle, finger, and feel. She had no limitations on seeing, hearing, or speaking. She had no environmental limitations.

C. **SUMMARY OF TESTIMONY**

During the August 16, 2004, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified

23

at the request of the ALJ.  During the supplemental hearing on June 21, 2005, Cathy Hodgson testified again.

**1.   Plaintiff's testimony.**

During the first hearing, plaintiff testified as follows:  She was 37 years old, and is currently 39 (Tr. at 48).  Plaintiff was 5' 1 3/4" tall and weighed 184 pounds (Tr. at 48).  She had been married for 16 years and had three children, ages six, four, and two (Tr. at 48).

Plaintiff graduated from high school and has an Associate of Arts degree (Tr. at 49).  She was working toward a degree in physical therapy, but she was putting her husband through school at the same time and they could not both go to college (Tr. at 49).  Plaintiff's husband is a physical therapist (Tr. at 50).  He travels and usually takes plaintiff on his assignments to make things easier for her (Tr. at 50).  They receive $500 per month in food stamps and are also on Medicaid (Tr. at 50).

Plaintiff has worked as a secretary, a physical therapy technician, a medical records assistant, a day care worker, and she has worked in delis and bakeries (Tr. at 50).

Plaintiff has difficulty writing because her fingers do not work very well (Tr. at 49).  She has arthritis (Tr. at 49).  She has chronic fatigue, and she feels tired no matter

24

how much sleep she gets (Tr. at 51). She has joint pain in her entire body, and she cannot tolerate standing very long on her feet (Tr. at 51). Plaintiff cannot wear shoes because they hurt her feet (Tr. at 51). No doctor has come up with a diagnoses, "They just tell me take a year off, take a vacation." (Tr. at 51). Plaintiff began having her symptoms two years before the hearing, in about November of 2002 (Tr. at 51).

Plaintiff takes Vioxx, but she does not remember the names of her other medications because she does not take them all the time (Tr. at 52). She only takes them when her pain is so unbearable that she can hardly stand it because her medications upset her stomach (Tr. at 52). She takes Tylenol a lot (Tr. at 53).

When plaintiff gets up in the morning she has to sit up on the side of the bed for a few minutes, then she stands up slowly (Tr. at 54). She goes to the living room to sit down for a while, and then her kids wake up on their own (Tr. at 54). Her husband helps her get the kids ready for the day, she gets ready for the day, and then they have breakfast (Tr. at 54). The kids play, and she may sit on the floor with them for a while (Tr. at 54). She reads books to them, or she lies on their bed while they are playing in their

25

room (Tr. at 54).

Plaintiff's daughter helps her some with things like setting and clearing the table (Tr. at 54). Plaintiff pours the milk, and her husband loads the dishwasher (Tr. at 54). Plaintiff sorts the laundry, but a laundry basket is too heavy for her to carry (Tr. at 55). Her husband brings her the baskets of clothes and she folds them with her daughter (Tr. at 55). In the afternoon plaintiff takes a nap with her sons for one to three hours (Tr. at 55).

Plaintiff has a valid drivers license and drives, but very little (Tr. at 49). She goes to church on Sundays, but sits in the balcony so she can stand if she needs to (Tr. at 56). She can bathe and dress herself (Tr. at 56). She can go up and down stairs, but she has to be very careful because she trips easily and her ankle goes out (Tr. at 56). Plaintiff's hips hurt when she walks (Tr. at 56). She can stand for one to two minutes, she can sit for three to five minutes, and she can lift two or three pounds (Tr. at 56-57). She can walk about a block (Tr. at 60). She has no grip in her hands, and she had difficulty writing her name to sign a paper (Tr. at 60). When she tries to pick up one of her sons, she has to stop because it hurts (Tr. at 62).

26

Plaintiff had vasculitis which was extremely painful (Tr. at 58). She had open sores and was bedridden (Tr. at 59). At the time of the hearing, plaintiff no longer had sores (Tr. at 59).

Plaintiff's back muscles get tight and it causes her to have headaches that make her sick to her stomach (Tr. at 67). The week before, she had a bad headache four days out of the week (Tr. at 67). A bad day to her would be where she could not get out of bed (Tr. at 68). "I haven't honestly had a bad day where I can't even get out of bed for a while" (Tr. at 68). Plaintiff has two to three days out of the month when she is in bed (Tr. at 68). She has one good day out of the week, when she feels really good, almost like herself again (Tr. at 68).

Plaintiff has to nap in the afternoon and sit down to rest eight to ten times a day for 20 minutes to an hour (Tr. at 69). Plaintiff is tired when she wakes up, and it takes her a couple of hours to wake up enough so that she can function well (Tr. at 63). There is a window "right about now during the day" that she feels her best (Tr. at 63). As it nears lunchtime, she begins to go downhill (Tr. at 63). She must lie down and take a nap in the afternoon to be able to function, to get the kids their dinner and help them get

27

ready for bed in the evenings (Tr. at 63).

Plaintiff has trouble remembering things (Tr. at 64).
The judge interrupted here and said, "I looked in the file
in the disability report which you sent in. . . [a]nd you
didn't say a thing about your hands, you didn't say anything
about memory loss." Plaintiff: "I didn't?" ALJ:
"Vasculitis, that[] was the only mention." Plaintiff:
"[S]ince then, I have appealed, and my health has gotten
worse since then." (Tr. at 64).

## 2. **Vocational expert testimony.**

Vocational expert Cathy Hodgson testified at the
request of the Administrative Law Judge. She testified that
plaintiff previously worked as an informal waitress,
performed generally light, semi-skilled and light in the
national economy, DOT 311.477-030; a desk clerk for a motel
performed generally light, semi-skilled and light in the
national economy, DOT 238.367-038; a housekeeper in a motel
performed light, unskilled light in the national economy,
DOT 323.687-014; a physical therapy aide performed medium,
which is a skilled position performed at the medium level in
the national economy, DOT 076.224-010; a nurse's aide
performed at the medium level, which is semi-skilled
performed at the medium level in the national economy, DOT

28

355.674-014; as a medical records clerk performed light,
which is a semi-skilled position performed at the sedentary
level in the national economy, DOT 203.582-054; and as a
daycare worker which is semi-skilled and performed at the
light level in the national economy, DOT 359-677-018 (Tr. at
71). Plaintiff has no transferrable skills (Tr. at 72).

The first hypothetical involved a person of plaintiff's
age, education, and experience, with a good ability to read,
write, and use numbers, and with all the limitations
described by plaintiff in her testimony (Tr. at 72). The
vocational expert testified that such a person could not be
employed due to the inability to complete a normal workday
(Tr. at 72).

The second hypothetical involved a person capable of
performing sedentary work (Tr. at 72). The vocational
expert testified that such a person could return to
plaintiff's past relevant work as a medical records
assistant or clerk (Tr. at 72).

The third hypothetical involved a person capable of
performing light work (Tr. at 73). The vocational expert
testified that the person could perform plaintiff's past
relevant work as a waitress, a desk clerk, a housekeeper/
cleaner, a daycare worker as described by the Dictionary of

29

Occupational Titles, and the sedentary job as a medical clerk (Tr. at 73).

The fourth hypothetical involved a person who needed to take a one to three hour nap every afternoon, and who could lift less than five pounds even on an occasional basis (Tr. at 73). The vocational expert testified that the person could not work due to the nap (Tr. at 73).

The fifth hypothetical involved a person who was unable to stand longer than 20 minutes, and could not sit for longer than 30 minutes, and could not lift five pounds or more (Tr. at 74). The vocational expert testified that such a person could not perform any work (Tr. at 74).

At the conclusion of the hearing, the ALJ ordered a consultative examination by a psychologist and with a physiatrist due to plaintiff's allegations that had not been alleged at the time she filed her application (Tr. at 74-75).

During the second hearing[12], the vocational expert testified as follows:

The first hypothetical involved a person who had the limitations set out by Dr. Akeson in his Medical Source

---

[12]Plaintiff did not testify during the supplemental hearing, which was extremely brief.

30

Statement - Mental (Tr. at 351).  The vocational expert testified that such a person could return to all of plaintiff's past relevant work (Tr. at 352).

The second hypothetical involved a person with the limitations set out by Dr. Corsolini in his Medical Source Statement - Physical (Tr. at 352).  The vocational expert testified that such a person could perform all of plaintiff's past relevant work except the day care worker and the teacher's aide position because of the postural limitations (Tr. at 352).

The vocational expert was asked what the postural requirements were for the waitress position, and she was unable to provide that information (Tr. at 353).  The physical therapy aide must be able to stoop, kneel, and crouch occasionally (Tr. at 353).  The housekeeper must be able to stoop, kneel, and crouch occasionally (Tr. at 353).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge George Wilhoit entered his opinion on August 3, 2005 (Tr. at 14-21).

At step one, he found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 15).

31

At step two, he found that plaintiff suffers from
fibromyalgia, controlled with treatment; mild carpal tunnel
syndrome controlled with treatment; history of vasculitis in
the lower extremities, fully resolved; history of
hyperthyroidism; Dysthymic Disorder; and Pain Disorder
associated with both depression and fibromyalgia, which in
combination are severe (Tr. at 18).

At step three he found that plaintiff's impairments do
not meet or equal a listed impairment (Tr. at 15).

The ALJ found that plaintiff has past relevant work as
a waitress, housekeeper, desk clerk, clinical therapy aide,
nurse aide, medical records clerk, and day care worker (Tr.
at 15). He analyzed her testimony at length and found her
subjective complaints not credible (Tr. at 16-18). He then
determined that she retains the residual functional capacity
to perform the exertional and nonexertional activities of
work, being limited only by the need to limit postural
activities to an occasional basis (Tr. at 18). He found
that she has the residual functional capacity as assessed by
Dr. Corsolini and the mental residual functional capacity as
assessed by Dr. Akeson.

He then relied on the testimony of the vocational
expert in finding at step four that plaintiff has the

residual functional capacity to return to her past relevant work as a waitress, desk clerk, motel housekeeper, physical therapy aide, or medical records clerk (Tr. at 19).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment

33

unless it is not supported by substantial evidence on the record as a whole.  <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant testified that she has carpal tunnel syndrome.  She has trouble gripping and dropping objects.  She has numbness in her hands.  She has

34

trouble writing and opening jars. Her symptoms worsen
as the day wears on. She has chronic fatigue. Her
muscles and joints hurt. She can stand for only 1-2
minutes but then her feet hurt. She can sit for 3-5
minutes, but then must change positions and recline as
needed. She can lift a maximum of 2-3 pounds and drops
greater weights. She can walk up to one block. She
lies down 8-10 times for 20-60 minutes each time daily.
She has pain in the bottom of her feet. She has
problems with her memory. She has insomnia. She has
headaches from back pain which can last as long as 4
days. She is bedridden on bad days, which occurs 2-3
times in a month. She takes several medications with
the adverse side effect of stomach upset.

The medical evidence does not support the claimant's
testimony as to the severity, duration, and frequency
of her subjective complaints and functional
limitations. The claimant has been treated by Laura
Vance, M.D., with the Bolivar Family Clinic since 2000.
She has received general and routine medical care for
the most part. She developed vasculitis in her legs in
February 2003, was seen in the emergency room on March
8th and 12th, and the condition was resolved within a
few weeks with antibiotic and steroid treatment. The
condition of vasculitis was resolved with treatment,
without complication, and without long term or
permanent residual effects. This impairment did not
last the requisite duration of 12 continuous months.

She was seen at the Bolivar Clinic in March 2003 for
ankle bursitis and in April 2003 for right foot and toe
sprain, all of which resolved without complication. . .
. A sleep apnea test was normal. . . . Dr. Tay noted
that the claimant had done extensive cleaning and
housework for 6 hours the day before. The claimant has
been diagnosed to have fibromyalgia, however, she has
not required strong pain medications. Generally, her
pain has been mild to moderate, and tolerable. The
claimant has been prescribed tiagabine for insomnia but
she only takes it as needed and then only 1/4 to 1/2 of
a pill. She has been prescribed Rofecoxide for muscle
ache, but only has had to take that medication
intermittently for muscle ache. According to the
medical records of Dr. Tay, the claimant has generally

experienced only mild, achiness. . . . Her
fibromyalgia is exacerbated when she "does too much"
and is stressed. These periods of exacerbation are
generally relieved by rest, sleep and over the counter
medications. Her condition is improved with exercise
and stretching. . . . [T]he claimant was seen on
August 23, 2004, by Dr. Tay with complaints of spasms,
achiness and cramping in her upper and mid back. She
described her pain as only mild to moderate and
generally tolerable. She has not tried taking any
medications for back pain. . . . The claimant related
that the rheumatologist had advised her to limit her
activities, get more sleep and not to overwork and
stress herself so and that "has really worked for her".
"For five weeks, she did nothing but tried to keep her
life simple and felt quite a bit better during that
time. Unfortunately with the Christmas season, she has
been quite a bit busier and is starting to feel the
chronic fatigue again." . . .

. . . There is no medical evidence of need for further
treatment for carpal tunnel syndrome since December
2003. . . .

. . . [Dr. Corsolini] completed a Medical Source
Statement - Physical form in which he assessed the
claimant to have no exertional limitations, no
manipulative limitations, and no environmental
limitations. He assessed the claimant as able to
climb, balance, kneel, crouch, crawl, and stoop on an
occasional basis. . . .

. . . Dr. Akeson completed a Medical Source Statement
- Mental form in which he assessed that there is no
evidence of limitations in any of the stated 20
nonexertional work functions. Dr. Akeson opined that
the claimant has the capacity to perform work related
mental activities on a sustained basis, as defined
under SSR 96-8, of: understanding, remembering, and
carrying out simple[13] instructions; making judgments

_____

[13]Actually, Dr. Akeson found that plaintiff could
understand and remember complex instructions, not just
simple instructions (Tr. at 304).

36

that are commensurate with the functions of unskilled
work; responding appropriately to supervision, co-
workers, and usual work situations; and dealing with
changes in a routine work setting.

The claimant has not been medically restricted or
assessed by any of her treating physicians to be unable
to engage in outside competitive employment. . . .

The claimant maintains a full and active lifestyle.
She takes care of her 3 young children who are not of
school age yet. Her husband does the shopping, but she
does all of the meal preparation which requires griping
[sic] and bilateral fine manual dexterity. She and her
husband share the laundry and housecleaning. She
drives as needed. In addition to taking care of her
family, the claimant has been taking care of her
mother-in-law who has had terminal cancer. The
claimant's husband takes jobs out of town that can last
for several months at a time. The claimant and
children are able to travel with him. The claimant is
fully independent for all self-care. . . . The
claimant did not have to quit working due to a
disability, but rather chose to leave the workforce,
which raises an issue of secondary gain in her claim of
disability now.

(Tr. at 16-18).

## 1.   *PRIOR WORK RECORD*

As the ALJ noted, plaintiff stopped working a year

before her alleged onset date because she was pregnant with

her third child and needed to take some time off.

## 2.   *DAILY ACTIVITIES*

Plaintiff reported in her Claimant Questionnaire that

she usually vacuums half the house one day and the other

half another day. She takes care of herself, her spouse,

37

and her three children, "meals, laundry, baths, tidy, clean up after them." Plaintiff was able to take care of her terminally ill mother-in-law who had cancer and was living with plaintiff and her family.

On March 27, 2003, plaintiff told Dr. Cohen that she was taking care of and home schooling her kids.

On May 29, 2003, plaintiff complained of leg pain but said that she had done extensive housework for six hours the day before.

On September 22, 2003, plaintiff told Dr. Tay that her husband had been working in Michigan; therefore, she was taking care of her children and her home by herself.

In December 2003, plaintiff was doing 15 minutes of stretching exercises and then 15 to 20 minutes on the treadmill every morning. Her energy level was better.

Plaintiff told Dr. Akeson that she has no problems writing, but she testified that she has difficulty writing because her fingers do not work very well.

## 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

In her Disability Report, plaintiff reported that she was unable to work solely because of the following symptoms: very painful legs and feet, unable to ambulate for long periods of time, legs aching at sleep time when having done

38

too much during the day. Plaintiff said nothing about depression, memory problems, grip problems, fatigue, or neck or back pain.

On her alleged onset date, plaintiff saw Dr. Shoemaker and described the rash on her feet as "a little bit painful."

Plaintiff was diagnosed with bursitis in March 2003, and was told to use ice. No medication was prescribed and there was no further treatment of bursitis or complaints of bursitis.

On August 28, 2003, plaintiff told Dr. Berg that about once every four to six months she has a headache.

On September 22, 2003, Dr. Tay noted normal short and long term memory and normal affect.

In December 2003, plaintiff told Dr. Tay that her pain was mild and it was exacerbated by doing too much. Dr. Tay found no tenderness in her joints, and he diagnosed fibromyalgia, improved. In January 2004, Dr. Tay noted normal short and long term memory and normal affect.

In January 2004, plaintiff told Dr. Cohen that she had been having some problems with her thyroid, but "overall feels that she is doing quite well and things are getting straightened now."

39

On January 26, 2004, plaintiff told Dr. Berg that she was exercising and she and her husband had organized their house which was taking some stress off plaintiff. Dr. Berg assessed thyroiditis which had resolved, and plaintiff was discharged from the endocrine clinic.

In April 2004, plaintiff told Dr. Tay that she had been exercising and felt like she had more energy. She described her pain as mild to moderate and generally tolerable. She was not taking her medication that had been prescribed for muscle aches. Dr. Tay noted that plaintiff had 100% grip, normal affect, normal long and short term memory.

In August 2004, plaintiff described her pain as mild to moderate and generally tolerable. She told Dr. Tay that her fibromyalgia had improved until three or four weeks earlier when she started feeling back spasms. She had tried no medication for her back pain. Plaintiff had only mild tenderness in her neck and parts of her back. She had normal affect, normal short and long term memory, and 100% hand grip. She was encouraged to continue exercising.

On August 26, 2004, plaintiff saw Dr. Berg for what Dr. Berg described as resolved thyroiditis.

40

## 4.  PRECIPITATING AND AGGRAVATING FACTORS

In December 2003, plaintiff told Dr. Vance that she had
simplified her life for five weeks and felt much better.
When she started doing a lot to prepare for Christmas, she
began feeling fatigued.  Plaintiff told Dr. Tay later that
month that her pain was exacerbated by doing too much, but
she still described her pain as mild.

Plaintiff told Dr. Berg that when she was living in a
condo, she felt good because she did not have to do as much
as when she was living in her house.

Dr. Akeson described plaintiff as a perfectionist,
which may be the cause of her trying to "do too much".

## 5.  DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

On March 14, 2003, plaintiff was given Prednisone and
an anti-inflammatory for her vasculitis.  Less than two
weeks later, on March 27, 2003, plaintiff's vasculitis was
"much improved." By October 15, 2003, it was noted to be
resolved, but there had been no complaints of vasculitis or
its symptoms after March 27, 2003.  I note here that
vasculitis was the only impairment listed in plaintiff's
application for disability benefits.

On April 30, 2003, plaintiff was diagnosed with plantar
fasciitis and was told to use shoe inserts and ice massage.

41

She was told to take Vioxx (an anti-inflammatory) daily, but the records show that she took it only occasionally.  By May 23, 2003, plaintiff's plantar fasciitis was noted as "resolving."

Plaintiff was found to have mild carpal tunnel syndrome; however, treatment consisted of splints, home exercises, over-the-counter anti-inflammatories, and avoidance of aggravating activities and crafts.

On October 15, 2005, plaintiff told Dr. Tay that her pain was better since she started doing daily stretching exercises.  Plaintiff was diagnosed with fibromyalgia, and was told to continue her stretching exercises.

Dr. Tay gave plaintiff medication to help her sleep, but she admitted she had not been using it.

In December 2003, plaintiff stated that her headaches were resolved with over-the-counter medications.

In April 2004, Dr. Tay assessed fibromyalgia and recommended that plaintiff continue stretching.

Plaintiff told Dr. Akeson that she only takes her medication when her pain is "high", not on a daily basis.

Plaintiff only reported stomach problems with her medication to Dr. Corsolini, the consulting physician she saw at the request of the ALJ.  She never complained of side

42

effects of her medicine to her treating doctors, and no
doctor ever changed or discontinued medication due to side
effects.

## 6. FUNCTIONAL RESTRICTIONS

On March 27, 2003, in response to her complaint of
fatigue, plaintiff was told to take vitamins, exercise,
develop good eating habits and good sleeping habits.

On June 3, 2003, Dr. Korte stated on a disability form
that plaintiff should not walk a long time, "no heavy
objects."

On August 28, 2003, Dr. Vance recommended that
plaintiff exercise to help in weight loss.

In January 2004, Dr. Tay recommended that plaintiff
continue stretching exercises and cardiovascular
conditioning (i.e., walking on the treadmill as she had been
doing daily).

In January 2004, Dr. Tay discharged plaintiff from his
care and recommended she continue treatment with her regular
doctor.

Dr. Akeson found no mental limitations. Dr. Corsolini
found normal range of motion, normal grip strength, normal
muscle strength, and some areas in the neck and back which
produced mild discomfort, but nothing rising to the level of

43

tenderness.  He found no functional restrictions other than
that plaintiff should only occasionally climb, balance,
kneel, crouch, crawl, and stoop.

**B.  *CREDIBILITY CONCLUSION***

I find that all of the <u>Polaski</u> factors discussed above
support the ALJ's credibility determination.  I also note
that the ALJ extensively discussed each factor and very
thoroughly supported his decision.

In addition, on September 16, 2004, plaintiff told Dr.
Akeson (the consulting psychologist) that she had thyroid
problems but had not been treated because they were still
working up the problem.  However, she had been to see her
endocrinologist on August 26, 2004, who said plaintiff's
thyroiditis was resolved and there was no need for any
follow up appointment.  Clearly plaintiff was attempting to
make her physical problems look worse than they were.

Plaintiff testified that she trips easily and her ankle
goes out; however, the only evidence in the record regarding
plaintiff's ankle was in March 2003 when she was told to use
ice on it.  Plaintiff testified that she has no grip;
however, her doctors consistently found 100% grip.

Plaintiff testified that she has to sit down eight to
ten times per day, but she never told any doctor about this

44

need and no doctor ever recommended that she sit down to rest.  Plaintiff testified that she has to take a one- to three-hour nap every day.  She mentioned to Dr. Berg in August 2004 (a visit that Dr. Berg, the endocrinologist, appeared to think was unnecessary) that she takes a nap with her kids, but no doctor ever recommended this, and plaintiff told Dr. Tay that she gets enough rest.

Plaintiff testified that she has trouble remembering things; however, he doctors consistently found normal long and short term memory, and Dr. Akeson found no problems with memory.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's credibility finding.  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ's residual functional capacity is vague and unrelated to the substantial medical evidence or testimony of record.

The ALJ must assess a claimant's residual functional capacity based on all of the relevant credible evidence.  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

45

As discussed at length above, the ALJ properly found that plaintiff's subjective allegations are exaggerated and are not credible. Therefore, it was proper for the ALJ to exclude that exaggerated testimony when arriving at plaintiff's RFC.

In arguing that the ALJ's RFC is against the great weight of the evidence, plaintiff states that the ALJ should have assessed limitations based on the following: severe limitations as a result of fibromyalgia and fatigue, right foot problems, right ankle problems, swollen great toe, plantar fasciitis, and carpal tunnel syndrome.

Problems related to fibromyalgia and fatigue. On March 27, 2003, Dr. Cohen noted that plaintiff had a normal sleep study. She recommended that plaintiff exercise, take vitamins, and develop good eating habits and good sleeping habits. Plaintiff had told Dr. Cohen that she was taking care of and home schooling her three children. On August 18, 2003, plaintiff told Dr. Berg that she was taking Cyclobenzaprine to help her sleep, but she was only taking it on an "as-needed" basis. On October 15, 2003, Dr. Tay prescribed Tiagabine to help plaintiff sleep. On December 1, 2003, plaintiff told Dr. Berg that she was fatigued and that Dr. Tay had given her a prescription to help her sleep

46

but she had not been taking it. On January 2, 2004, she
told Dr. Tay she was only using that medication two or three
times per week. On April 6, 2004, she told Dr. Berg that
she had been sleeping better. On April 8, 2004, she told
Dr. Tay she was only taking 1/4 to 1/2 tablet of the
Tiagabine for insomnia. On August 23, 2003, she told Dr.
Tay she was taking the Tiagabine "occasionally" for
insomnia.

When an impairment can be controlled by treatment or
medication, it cannot be considered disabling. Brown v.
Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to
follow a prescribed course of remedial treatment without
good reason is grounds for denying an application for
benefits. Id.; 20 C.F.R. § 416.930(b). Plaintiff never gave
her doctors any reason why she was not taking the
medications prescribed to help her sleep. She either
reported that she had not taken the medicine, she was taking
it only occasionally, or she was taking a smaller dosage
than what had been prescribed.

On September 22, 2003, Dr. Tay suspected that plaintiff
may have fibromyalgia. He ordered some blood work, but
plaintiff received no treatment for fibromyalgia. By
October 15, 2003, plaintiff reported that her symptoms were

47

improved because she had been doing stretching exercises.
Dr. Tay told her to continue her exercises. On January 2,
2004, Dr. Tay noted that plaintiff's fibromyalgia was
improved, again only through stretching exercises and
walking on her treadmill. Plaintiff had said that she was
getting enough rest, but when she tried to do too much with
her three children, she would get worn out. Dr. Tay
discharged plaintiff from his care and told her to continue
her exercises.

Plaintiff was never given any medication for
fibromyalgia symptoms other than the sleeping medication
which she rarely used as directed. No treatment was ever
needed other than plaintiff's performing stretching
exercises and cardiovascular exercises. Plaintiff described
her pain only as mild to moderate and also said that it was
tolerable. She never described her pain to any treating
physician as "severe", as she argues in her brief.

The ALJ discussed the record at length and determined
that plaintiff's limitation in postural activities
(occasionally only) were the result of her fibromyalgia.
The record does not support any greater restriction based on
this impairment.

48

Right foot problems.  As the ALJ pointed out, plaintiff
complained of mild foot pain on February 28, 2003, due to
what was diagnosed as vasculitis.  The pain clearly got
worse; however, the vasculitis was "much improved" less than
a month later, and on March 28, 2003, a dermatologist
recommended she stay on the antibiotic another four to six
weeks until the last of the lesions had crusted over.  On
April 23, 2003, the last of the lesions were healing well.
On October 15, 2003, Dr. Tay noted that plaintiff's
vasculitis was resolved.  There is no further mention of
problems with vasculitis; therefore, the ALJ correctly found
that this impairment did not last the requisite 12 months.

Right ankle problems.  Plaintiff suffered from a right
foot sprain on April 11, 2003.  X-rays were normal.
Plaintiff was told to use an Ace wrap for support and over-
the-counter pain relievers as needed.  Plaintiff did not
complain to any other doctor about ankle problems related to
this foot sprain.

Every isolated incident in a person's medical file is
not grounds for a finding of decreased functioning.  There
is no evidence that this foot sprain was anything other than
an isolated incident or that it caused anything but
temporary minor discomfort.  In fact, plaintiff told her

49

doctor on April 24, 2003 -- less than two weeks later --
that her ankle was getting better.

Swollen great toe.  On April 24, 2003, plaintiff's big
toe was swollen.  X-rays of the toe showed no fracture or
dislocation.  The doctor noted only minimal swelling.
Plaintiff was able to perform dorsal and plantar flexion
with her toe.  Plaintiff was told to use Tylenol for pain
and to put ice on her toe if she wanted to.  The record also
states, "She is to let us know if she doesn't improve."
There are no further complaints about plaintiff's toe;
therefore, the reasonable assumption is that plaintiff's toe
did in fact improve.  Plaintiff's temporarily swollen big
toe is not a basis for permanently reducing her residual
functional capacity.

Plantar fasciitis.  On April 30, 2003, plaintiff was
diagnosed with plantar fasciitis on her right foot.  She was
told to use a proper shoe with an insert; however, plaintiff
admitted at her next visit that she never bought the insert.
She was prescribed Vioxx to be taken daily; however,
plaintiff told her doctors repeatedly that she did not take
her medicine daily.  A month later, plaintiff told her
doctor her feet felt better, despite not having worn the
shoe inserts.  She was again told to get the inserts and

50

take the Vioxx.  When plaintiff visited Dr. Berg on August
18, 2003, she did not list Vioxx as one of her medications.
On October 15, 2003, plaintiff saw Dr. Tay and did not Vioxx
as one of her medications.  On December 1, 2003, plaintiff
saw Dr. Berg and said only that she was supposed to be
taking a medication to help her sleep, but she was not
taking it.  She did not list Vioxx as a medication.  On
August 26, 2004 -- more than a year after she was diagnosed
with plantar fasciitis, plaintiff told Dr. Berg that she was
taking Vioxx "as needed".  She told Dr. Akeson that she
takes her Vioxx when her pain is high.  She told Dr.
Corsolini that she takes the Vioxx every two or three days.
Although plaintiff told one consulting physician that Vioxx
causing stomach upset, there is nothing in any of her
treating physicians' records suggesting that plaintiff
complained of any side effects of Vioxx.  Rather, it shows
that plaintiff did not even list Vioxx as a medication for
more than a year after she was told to take it daily.

     When an impairment can be controlled by treatment or
medication, it cannot be considered disabling.  Brown v.
Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). Failure to
follow a prescribed course of remedial treatment without
good reason is grounds for denying an application for

benefits. Id.; 20 C.F.R. § 416.930(b).

On August 28, 2003, Dr. Berg encouraged plaintiff to exercise. There is nothing in that record suggesting that plaintiff thought it would be a problem for her to exercise due to her plantar fasciitis. She never mentioned that condition to Dr. Berg. On January 2, 2004, plaintiff told Dr. Tay that she had been walking on her treadmill for 15 to 20 minutes each day. Clearly her plantar fasciitis did not cause her any problems with her ability to walk. Throughout 2004, Dr. Tay continued to encourage plaintiff to perform cardiovascular exercises.

Because plaintiff (1) failed to wear the shoe inserts as prescribed, (2) failed to take Vioxx daily as prescribed, (3) failed to report any further foot problems after her initial diagnosis with plantar fasciitis, (4) failed to mention any foot problems to her doctors who recommended that she exercise, and (5) was able to walk for 15 to 20 minutes each day on a treadmill without problems to her feet, plaintiff's plantar fasciitis does not provide a basis for a reduced residual functional capacity.

Carpal tunnel syndrome. Plaintiff was diagnosed with carpal tunnel syndrome on August 18, 2003, after Dr. Weber found "mild" neuropathy at the wrist. Dr. Weber recommended

52

plaintiff use splints, do home exercises, and use an anti-inflammatory for one week.

On December 18, 2003, plaintiff saw Dr. Vance and commented that with Christmas coming up, she was quite a bit busier and was therefore experiencing more fatigue. The same day, plaintiff had another sensory nerve study with Dr. Weber who found improvement on her left wrist to normal values and still only mild neuropathy on the right wrist with "minimal symptoms". He told her to avoid crafts. It is unlikely a doctor would tell his patient to avoid crafts unless the doctor was aware that the patient was making crafts. Therefore, with the Christmas season, plaintiff's complaint of being much busier, and Dr. Weber's admonition against doing crafts, the record suggests that plaintiff's crafts were causing her "minimal symptoms".

In any event, plaintiff was never described as having anything other than minimal symptoms on her right wrist, her left wrist was normal on the second visit, she was never given anything other than an over-the-counter anti-inflammatory for her symptoms. There is no further mention in the medical records of plaintiff's carpal tunnel syndrome, and she never complained of pain from carpal tunnel syndrome at any time in the future. In fact,

53

plaintiff was found to have 100% hand grip on April 4, 2004,
and August 23, 2004. No doctor has ever found that
plaintiff had a reduced ability to grip. This impairment is
not a basis for a reduced residual functional capacity.

Finally, plaintiff notes a recommendation by her
podiatrist, Dr. Korte, who stated on June 3, 2003, that
plaintiff should "not walk long time" and "no heavy
objects". There is no evidence that plaintiff continued
treatment with Dr. Korte, there is no evidence (as discussed
above) that plaintiff ever complained to any treating
physician of trouble walking, and there is evidence that
plaintiff was actually able to walk on her treadmill every
day. In any event, the jobs that the ALJ found that
plaintiff could perform are light jobs which require lifting
no more than 20 pounds occasionally or ten pounds
frequently, which is consistent with Dr. Korte's
recommendation for "no heavy objects". The medical records
clerk position is performed at the sedentary level in the
national economy, and according to the Dictionary of
Occupational Titles, that job requires standing and walking
only for brief periods of time.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 16, 2007

55